# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                                )
**UNIVERSITY OF MASSACHUSETTS**                 )
**BIOLOGIC LABORATORIES and**                   )
**THIRD SECTOR NEW ENGLAND, INC.,**             )
                                                )    **Civil Action No.**
         **Plaintiffs,**                        )    **16-11459-FDS**
                                                )
         **v.**                                 )
                                                )
**CSL BEHRING AG,**                             )
                                                )
         **Defendant.**                         )
_____)

### MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO REMAND AND DEFENDANT'S MOTION TO DISMISS

**SAYLOR, J.**

This is an action for declaratory judgment arising out of a contract dispute.  In 2002, the University of Massachusetts Biologic Laboratories ("MassBiologics"), Third Sector New England ("TSNE"), and a predecessor to CSL Behring AG ("CSL") entered into a licensing agreement.   Under the agreement, TSNE and MassBiologics granted CSL the exclusive right and license to technology related to the prevention and treatment of cytomegalovirus infection using immunoglobulin and monoclonal antibodies.  CSL was to pay MassBiologics and TSNE royalties on the sale of products made using that technology, including a product called CytoGam.

In September 2015, CSL sent letters to MassBiologics and TSNE stating its belief that it was no longer required to pay royalties under the licensing agreement.  MassBiologics and TSNE then filed this declaratory judgment action in the Suffolk Superior Court seeking to clarify the parties' rights and obligations under the agreement.  Asserting diversity jurisdiction, CSL

removed the action to this Court.

MassBiologics and TSNE have now moved to remand the action to state court.  They contend that complete diversity is lacking because MassBiologics is an arm of the state and therefore not a citizen of Massachusetts for the purposes of diversity jurisdiction.  CSL has moved to dismiss for failure to state a claim upon which relief can be granted.

For the reasons stated below, plaintiffs' motion to remand will be granted.  CSL's motion to dismiss will remain pending after the remand.

## I.   Background

### A.   Factual Background

On April 23, 1990, Third Sector New England ("TSNE"), a Massachusetts non-profit corporation, and Molecular Vaccines (later known as MedImmune) entered into a licensing agreement concerning the production of an anti-cytomegalovirus product.  (Compl. ¶ 6, 8). Cytomegalovirus ("CMV") is a common herpes virus that can be dangerous for individuals with weakened immune systems, such as organ-transplant recipients.  (Compl. ¶ 7).  Under the agreement, TSNE agreed to transfer to MedImmune the information and technical assistance necessary to enable MedImmune to manufacture, test, and package hyperimmune CMV intravenous immunoglobulin, later sold as CytoGam.  (Compl. ¶ 8).  TSNE also granted MedImmune an exclusive right and license to TSNE's "Technology," which was defined as any "discovery, know how, invention, improvements, development, trade secret, data, governmental approvals or licenses" concerning the prevention and treatment of CMV.  (Compl. ¶ 10, 11).

MedImmune agreed to pay TSNE royalties of ten to fifteen percent of the net sales of products made using TSNE's "Technology," including CytoGam.  (Compl. ¶ 14).  MedImmune also agreed to "use reasonable efforts under the circumstances" to commercialize, market, and

sell CMV-related products.  (Compl. ¶ 15).

The University of Massachusetts Biologic Laboratories ("MassBiologics") was established in 1996 by the Massachusetts legislature in order to "research, develop[] and produc[e] . . . vaccines and biologic products designed to reduce or prevent morbidity and mortality in the commonwealth."  Mass. Gen. Laws ch 75, § 43(a).  In 2002, MedImmune, TSNE, and MassBiologics entered into an assignment agreement that transferred TSNE's rights, interests, and obligations under the original agreement to MassBiologics, reserving to TSNE, among other things, the right to a portion of the royalties paid.  (Compl. ¶ 19, 20).

In December 2006, MedImmune assigned all of its rights and obligations under the agreement to ZLB Behring AG (later known as CSL Behring AG).  (Compl. ¶ 22, 23).  Since 2007, CSL has paid royalties to MassBiologics and TSNE as required by the agreement. However, on September 7, 2015, CSL sent letters to MassBiologics and TSNE stating its belief that, under the terms of the agreement, it was no longer obligated to pay royalties.  (Compl. ¶ 31).

### B.      Procedural Background

On January 20, 2016, MassBiologics and TSNE filed a complaint in the Suffolk County Superior Court seeking (1) a declaratory judgment affirming that CSL is required to continue to pay royalties on sales of CytoGam and (2) specific performance of CSL's obligations under the agreement.  (Compl. ¶ 35, 36).  On July 13, 2016, CSL removed this action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.

TSNE and MassBiologics have moved to remand this action back to the Suffolk County Superior Court.  CSL has moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

## II.     Analysis

### A.     Plaintiffs' Motion to Remand

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  The burden of establishing federal jurisdiction is placed upon the party seeking removal (here, CSL).  *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921).

CSL contends that this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), which provides for jurisdiction over cases between citizens of different states where the amount in controversy exceeds $75,000.  It is well-settled that "a State is not a 'citizen' for purposes of diversity jurisdiction."  *Moor v. Cnty. of Alameda*, 411 U.S. 693, 717 (1973).  Rather, a state is treated as a "stateless entity," and the existence of a state party on either side precludes the exercise of diversity jurisdiction.  *See D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra*, 661 F.3d 124, 126 (1st Cir. 2011); *U.S.I. Properties Corp. v. M.D. Const. Co.*, 230 F.3d 489, 499 (1st Cir. 2000); *see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 27 (1st Cir. 2000) ("Notwithstanding the joinder of other diverse parties, the presence of an Indian tribe [as a stateless party] destroys complete diversity.").

While a political subdivision of a state is generally a citizen for diversity purposes, it is not a citizen if "it is simply 'the arm or alter ego of the State.'"  *Moor*, 411 U.S. at 717–18 (quoting *State Highway Comm'n of Wyoming v. Utah Constr. Co.*, 278 U.S. 194, 199 (1929)).  If an entity is an arm of the state, then it is considered to be the state itself for purposes of diversity

jurisdiction.[1]

The question here is thus "whether the [Commonwealth of Massachusetts] remains the *real party in interest*, notwithstanding [MassBiologics'] designation as the nominal plaintiff." *Chesterton*, 2 F.3d at 1203 (emphasis in original). That question can only be answered following a fact-intensive inquiry as to the nature of MassBiologics in order to determine whether it is sufficiently independent of the State to require that it be treated as a citizen of Massachusetts for the purposes of diversity jurisdiction. *Id.* at 1204.

The First Circuit has set forth a non-exhaustive list of criteria to guide courts in determining whether an entity is an "arm" or "alter ego" of the State:

> Whether the entity (1) performs an "essential" or "traditional" governmental function, as opposed to a nonessential or merely proprietary one; (2) exercises substantial autonomy over its internal operations; (3) enjoys meaningful access to, and control over, funds not appropriated from the State treasury; (4) possesses the status of a separate "public corporation"; (5) may sue and be sued in its own name; (6) can enter into contracts in its own name; (7) has been granted a state tax exemption on its property; or (8) has been expressly debarred from incurring debts in the State's name or behalf. These diverse considerations are designed to disclose the extent to which state law endows the . . . State-related entity with the operational authority, discretion, and proprietary resources with which to function *independently* of the State.

*Id.* at 1205 (emphasis in original) (internal citations omitted). "While arm-of-the-state status is ultimately a question of federal law, 'that federal question can be answered only after considering the provisions of state law that define the [entity's] character.'" *United States ex rel. Willette v. Univ. of Massachusetts, Worcester*, 812 F.3d 35, 40 (1st Cir. 2016) (quoting *University of California v. Doe*, 519 U.S. 425, 429 n.5 (1997) (holding that University of Massachusetts Medical School is state agency, not a "person," and therefore exempt from suit

---

[1] The inquiry of whether a public entity is an arm of the state for diversity purposes is similar to that of whether such an entity qualifies as "the State" for purposes of Eleventh Amendment sovereign immunity. *University of Rhode Island v. A.W. Chesterton Co.*, 2 F.3d 1200, 1203 (1st Cir. 1993).

under the False Claims Act).

Furthermore, "removal statutes are to be narrowly construed." *Esposito v. Home Depot U.S.A.*, 590 F.3d 72, 76 (1st Cir. 2009) (*citing Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941)).  "A presumption in favor of remand is necessary because if a federal court reaches the merits of a pending motion in a removed case where subject matter jurisdiction may be lacking it deprives a state court of its right under the Constitution to resolve controversies in its own courts." *University of South Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999).  Thus, "if federal jurisdiction is doubtful, a remand is necessary." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *accord Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 11 (1st Cir. 2004) (stating that ambiguity as to source of federal law establishing federal question jurisdiction "ought to be resolved against removal").

### 1.    <u>Traditional Government Function</u>

MassBiologics was created by statute to research, develop, and produce "childhood vaccines and biologic products designed to reduce or prevent morbidity and mortality in the commonwealth, including but not limited to those products which may be of little or no interest to commercial manufacturers and are therefore otherwise substantially unavailable to the citizens of the commonwealth." Mass. Gen. Laws ch. 75, § 43(a).  Supporting the public health through vaccination has long been considered an important state objective.  *See Jacobsen v. Mass.*, 197 U.S. 11, 25 (1905).

MassBiologics was originally housed within the Massachusetts Department of Public Health.  (Def. Mem. Ex. A).  In 1996, the Massachusetts legislature transferred it to the University of Massachusetts, declaring that the transfer was "necessary for immediate preservation of the public health and convenience" in order to enable the laboratories to

"maintain their public purpose, preserve their ability to compete in an increasingly competitive marketplace and maximize their value to the commonwealth." (*Id.*). That transfer is significant for two reasons.

First, the reason for its transfer suggests that the Massachusetts legislature views MassBiologics as serving a "public purpose" and an important governmental function. *Cf. Neo Gen Screening, Inc. v. New England Newborn Screening Program*, 1998 WL 35278283 at * 2 (D. Mass. 1998) (holding that Newborn Screening Program, transferred from Department of Public Health to University of Massachusetts Medical School, acts as agency of the State because it carries out legislatively established public-health mandate).

Second, it is significant that MassBiologics was transferred from one arm of the state (the Department of Public Health) to another (the University of Massachusetts). *See Willette*, 812 F.3d at 40 (holding that University of Massachusetts Medical School is an arm of the state). Public universities are generally considered to be arms of the state because of the "distinctive, public-oriented role" that they play. *Id.* The fact that MassBiologics engages in research and development rather than teaching does not require a different result. *See University of Massachusetts v. Robl*, 2004 WL 1725418 at *1 (D. Mass. 2004) (recognizing research as well as teaching as traditional function of public universities).

The fact that MassBiologics generates revenue, and that one reason for the transfer was to "preserve [its] ability to compete" in the marketplace, does not mean that it exists for predominantly proprietary rather than governmental purposes. *See Robl*, 2004 WL at *1 (D. Mass. 2004) (holding that the Commercial Ventures and Intellectual Property office of the University of Massachusetts is an arm of the state and noting that "the competition for scarce public resources has inclined most contemporary state-owned universities to adopt an

entrepreneurial role with respect to research that offers the prospect of a commercial dividend"). Furthermore, the specific marketplace in which MassBiologics operates is the development childhood vaccines and so-called "orphan drugs"—treatments for rare diseases that historically have not been filled by the marketplace due to the lack of pecuniary reward. Charging private clients a fee in order to enable the continued production of biologic products aimed at improving the public health does not mean that MassBiologics serves primarily proprietary functions. *See Neo Gen Screening*, 1998 WL at *1, 2 (holding that Newborn Screening Program, housed within University of Massachusetts Medical School, is arm-of-the-state despite charging fee for its "state-of-the-art" testing).

### 2.      Autonomy over Internal Operations

The next inquiry is whether MassBiologics exercises considerable autonomy over its internal operations. The more autonomy it has, the less likely it is that it is an arm of the state. *Cf. Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority*, 991 F.2d 935, 940 (1st Cir. 1993) ("[T]he more tightly the agency and the state are entangled, the more probable it becomes that the agency shares the state's Eleventh Amendment immunity.").

In *Chesterton*, the First Circuit concluded that the University of Rhode Island was not an arm of the state—despite its status as a public university—in large part because of the "extraordinary measure of autonomy" exercised by its governing body, the Rhode Island Board of Higher Education. 2 F.3d at 1206. The First Circuit found it significant that (1) while ten of the thirteen board members were appointed by the Governor, they could only be removed for cause; (2) the board could unilaterally appoint and dismiss the commissioner of higher education; and (3) the board had plenary power over the post-secondary school organizational structure, including creating and abolishing departments and programs of study. *Id.* at 1208.

MassBiologics does not have such an extraordinary degree of autonomy.  The Massachusetts legislature established its advisory board "to advise the president and board of trustees of the university with respect to the operation of the biologic laboratories."  Mass. Gen. Laws ch 75, § 43(b).  Defendant, however, contends that "MassBiologics has even greater independence" than the Rhode Island Board of Higher Education, because the board has no gubernatorial appointees and is only advisory—leaving the government with no real control over MassBiologics' operations.  That argument, however, is unpersuasive for at least two reasons.

First, the advisory board includes two *ex officio* positions:  the Commissioner of Public Health and the Director of the Childhood Immunization Program of the Department of Public Health.  Mass. Gen. Laws ch. 75, § 43(b).  The Commissioner of Public Health is appointed by the Secretary of Health and Human Services, subject to the approval of the Governor, and is removable without cause.  Mass. Gen. Laws ch. 17, § 2.  The Director of the Childhood Immunization Program is appointed by the Commissioner of Public Health.  *Id.* § 4.  Thus, while no member of the advisory board is directly appointed by the Governor, there is nonetheless a substantial government presence on the board.

Second, while the board serves in an advisory capacity only, it is important to note whom it advises:  "the president and board of trustees of the university."  Mass. Gen. Laws ch. 75, § 43(b).  It is the university board of trustees that exercises real control over MassBiologics' operations.  *Id.* § 43(d).  The composition of the university board of trustees, and not just that of the advisory board, is therefore relevant in determining the degree of independence of MassBiologics.  As defendant acknowledges, "the Governor exercises direct control over 17 of 19 board positions, and picks the chair."  (Def. Mem. Opp. at 8).  In *Willette*, the composition of the university board of trustees favored a finding that the University of Massachusetts Medical

School was an arm of the state.  *See Willette*, 812 F.3d at 40–41 (noting that the "substantial

level of control" that board of trustees exercises over "both the University and UMMS strongly

indicates arm-of-the-state status").  Here, likewise, the composition of the same board of trustees

likewise suggests that MassBiologics is an arm of the state.

### 3.      Access to and Control over Funds

The next inquiry is whether MassBiologics has significant financial autonomy from the

state.  Financial independence—particularly in the form of independent revenue streams and

limited government control over financial accounts—may suggest that an entity is not an arm of

the state.  *See Metcalf & Eddy, Inc.*, 991 F.2d at 942 (stating that, in Eleventh Amendment

context, "[t]he power and opportunity to generate a revenue stream and thereby finance an

agency's operations is an important attribute of the agency's separate identity"); *Chesterton*, 2

F.3d at 1210–11 (finding that a lack of state control over financial accounts suggests entity is

"citizen" for diversity purposes).

Only two percent of the revenues of MassBiologics come from legislative appropriations.

That factor weighs in favor of a finding of autonomy.  Furthermore, its revenues are kept in a

separate trust, not merged into the state's general fund.  Mass. Gen. Laws ch 75, § 43(g); *see*

*Chesterton*, 2 F.3d at 1210–11 (finding that maintenance of segregated accounts for

nonappropriated funds suggests autonomy).  However, the board under consideration in

*Chesterton* had complete discretion regarding the disbursement of its separate funds.  *Chesterton*,

2 F.3d. at 1210.  MassBiologics does not have that same discretion.  The board of trustees of the

University of Massachusetts, not MassBiologics, controls the trust, and its funds can be used

only for the limited purposes established by the legislature.  Mass. Gen. Laws ch. 75, §§ 11, 43.

In addition, MassBiologics is required to submit a "detailed report" of its activities,

revenues, expenditures, and one- and five-year financial plans to the state legislature each year. Mass. Gen. Laws ch. 75, § 43(f); *see Rutledge v. Ariz. Bd. of Regents*, 660 F.2d 1345, 1349–50 (finding requirement to submit "detailed report" to governor each year suggests arm-of-state status).  The department of the state auditor is also required to conduct an audit of MassBiologics "not less than once every two years."  Mass. Gen. Laws ch. 74, § 43(f).  In *Chesterton*, the First Circuit found that required audits did not detract from the board's autonomy.  However, Rhode Island law mandated that such audits monitor only for fraudulent or illegal activity and prohibited auditors from "interpose[ing] his or her judgment regarding the wisdom or expediency of any item or items of expenditure."  2 F.3d at 1211.  Here, by contrast, the department of the state auditor in Massachusetts is required to follow the standards for audits of governmental organizations published by the Comptroller General of the United States.  Mass. Gen. Laws ch. 11, § 12.  That includes making determinations regarding economy and efficiency.  *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-12-331G, GOVERNMENT AUDITING STANDARDS 18 (2011).

### 4.     Remaining Factors

The remaining *Chesterton* factors may be considered quickly.  MassBiologics is not a separate public corporation with a distinct legal existence separate from the state; rather, MassBiologics is a part of the University of Massachusetts, which is itself "a public institution of higher learning within the system of public higher education."  Mass. Gen. Laws ch. 75, § 1; *cf. Willette*, F.3d 35 at 40 (concluding that University of Massachusetts Medical School is arm of the state).  It does have the ability to sue and be sued, as well as enter into contracts in its own name.  However, its power is circumscribed, as it must have the authorization of the board of trustees to "enter into agreements with private parties with respect to the research, development

and production of vaccines and other biologic products" and it must give preference to private companies that operate in the commonwealth.  Mass. Gen. Laws ch. 75, § 43(d).  Finally, MassBiologics has been only partly debarred from incurring debts in the commonwealth's name.  *Id.* § 43(c).

On balance, consideration of the factors suggests that MassBiologics is an arm of the state, and not a citizen, for purposes of diversity jurisdiction.[2]  There is, therefore, a lack of complete diversity.  *See Strawbridge v. Curtiss*, 3 Cranch 267, 267 (1808); *American Fiber & Finishing, Inc. v. Tyco Healthcare Group*, 362 F.3d 136, 139 (1st Cir. 2004).  Pursuant to 28 U.S.C. § 1447(c), this Court is required to remand this action to the Suffolk County Superior Court.

### B.      Defendant's Motion to Dismiss

Because plaintiffs' motion to remand will be granted, this Court will not reach defendant's motion to dismiss.  *See University of S. Ala.*, 168 F.3d at 411 ("[A] federal court must remand for lack of subject matter jurisdiction notwithstanding the presence of other motions pending before the court.").

## III.      Conclusion

For the foregoing reasons, plaintiff's motion to dismiss for lack of subject matter jurisdiction is GRANTED.  The motion to dismiss of defendant CSL Behring AG will remain pending after the remand.

---

[2] No evidentiary hearing is required.  Unlike in *Ainsworth Aristocrat Inter. Pty. Ltd. v. Tourism Co. of Com. of P.R.*, 818 F.2d 1034 (1st Cir. 1987), where the First Circuit remanded for a hearing, there is no open question as to whether to MassBiologics receives significant funding from the Commonwealth.  *Cf. id.* at 1038–39.  Nor is a hearing required to determine "whether the Governor or anyone in his administration exerts significant direct influence over the daily operations" of MassBiologics.  *Id.* at 1038.  Defendant concedes that the Governor exercises direct control over the Board of Trustees of the University of Massachusetts (Def. Mem. Opp. at 8), and it is that body that exercises direct control over MassBiologics.  *See* Mass. Gen. Laws ch. 75, § 43(b).

**So Ordered.**

                                                /s/ F. Dennis Saylor
                                                F. Dennis Saylor IV
Dated:  November 1, 2016                    United States District Judge